## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

MARK W. SPINELLI,

      Plaintiff,

vs.

COHERUS BIOSCIENCES, INC.,

      Defendant.

CIVIL ACTION NO.  1:23-cv-00361-LF-KK

**AMENDED COMPLAINT FOR VIOLATIONS OF THE NEW MEXICO HUMAN RIGHTS ACT, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, RETALIATORY DISCHARGE, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

      **COMES NOW** Plaintiff, Mark W. Spinelli, by and through his attorney of record, DeNiro Law, LLC, (Vanessa L. DeNiro, Esq.) and submits this Amended Complaint, and for his causes of action states the following:

### NATURE OF THE ACTION

      1.     Plaintiff's causes of action are grounded in the unlawful and outrageous treatment he received as an employee of Defendant, Coherus BioSciences. Plaintiff alleges that Defendant willfully violated his rights, benefits, and privileges accorded to him under the New Mexico Human Rights Act ("NMHRA"), NMSA 1978, § 28-1-1 et seq. This is an action for monetary damages, to redress Defendants' unlawful employment practices against Plaintiff, including its discriminatory treatment and harassment of Plaintiff due to his medical disability and sincerely held religious beliefs which prevented him from receiving the COVID-19 vaccination. Defendant also willfully violated Plaintiff's rights to be free from retaliatory discharge, breached their

implied employment contract, breached the implied covenant of good faith and fair dealing, and engaged in extreme, outrageous and intentional conduct which caused Plaintiff to suffer severe emotional distress.

## PARTIES, JURISDICTION & VENUE

2.      Plaintiff, Mark W. Spinelli, is a resident of Bernalillo County, New Mexico.

3.      Defendant, Coherus BioSciences, is a California limited liability company doing business in the State of New Mexico and engaged in business in Bernalillo County.

4.      On November 19, 2021, Plaintiff filed his Charge of Discrimination with the New Mexico Human Rights Bureau.

5.      On December 13, 2022, the New Mexico Human Rights Bureau issued its Order of Non-Determination. The Plaintiff's initial Complaint was timely filed with the Second Judicial District Court on March 13, 2023.

6.      On April 27, 2023, Defendant removed this case to the Federal Court.

7.      Defendant filed its Partial Motion to Dismiss on May 3, 2023.

8.      This First Amended Complaint is filed timely pursuant to FRCP 15(a)(1)(B).

9.      Jurisdiction and venue are proper in this Court.

## STATEMENT OF FACTS

10.      Mr. Spinelli was gainfully employed by another Oncology pharmaceutical company when he was recruited to work for Defendant.

11.      On February 1, 2021, Mr. Spinelli began working for Defendant as an Oncology Account Manager ("OAM").

12.      The duty of the OAM was to develop relationships with Oncology practices within a defined geography, and present education materials and information to encourage them

to use a product called Udenyca as their preferred biosimilar Pegfilgrastim, which is a medicine used to treat low white blood cells that is caused by cancer treatments.

13.     The sales objectives were set by the company and the OAM quotas were set based on territory potential and historical sales data.

14.     Ultimately, Mr. Spinelli's role and primary purpose was to increase sales of Udenyca through any approved communications, such as face-to-face appointments, video conferences, telephone calls, and association meetings.

15.     At the time of hiring, COVID-19 restrictions were still at their height and therefore all work was performed remotely since Mr. Spinelli's first day. In fact, he was interviewed and hired through an entirely virtual process, via Zoom and telephone calls, without ever having any in-person interactions with management or co-workers.

16.     While employed by Defendant, Mr. Spinelli did not ever work in an office setting with other employees and was one of the only OAMs located in New Mexico.

17.     Despite having COVID-19 restrictions in place and indications that vaccines were actively being produced, at no time did Defendant advise or warn Mr. Spinelli that he would ever be required to be injected with the COVID-19 vaccine, which had already become available in December of 2020.

18.     On or about May 26, 2021, Mr. Spinelli's manager, John Hamm, was fired for refusing to get vaccinated and for refusing to pressure his employees to get vaccinated.

19.     In June of 2021, Defendant decided that unvaccinated employees were not allowed to attend the National Sales Meeting ("NSM") in person.

20.     The NSM was a week-long event designed to provide sales staff valuable tools and resources through a combination of seminars, product demonstrations, and daily "breakout sessions" for a more hands-on experience with smaller group sizes.

21.     Employees, including Mr. Spinelli, who were forced to attend the NSM remotely, did not receive any of the training materials that were covered during the week of the NSM.

22.     Furthermore, remote attendees were not allowed to participate in the highly informative breakout sessions, nor were they able to receive paid lunches and other perks, despite being on Zoom meetings for over eleven hours on the first day.

23.     The NSM event was the beginning of a distinct pattern and practice of Defendant's disparity in treatment of vaccinated and unvaccinated employees.

24.     On June 14, 2021, during the closing remarks on the final day of the NSM, a company-wide email was sent to announce Defendant's COVID-19 Vaccine Mandate, which required all employees to show proof of vaccination by July 19, 2021.

25.     On June 28, 2021, Defendant's Vice President of Sales sent a company-wide email requiring that sixty (60%) percent of all customer interactions must be face-to-face. The Vice President of Sales sent a second email shortly after, stating that all unvaccinated employees are prohibited from having face-to-face interactions with customers.

26.     Mr. Spinelli was assigned approximately forty (40) customer accounts. At the time, only two (2) of Mr. Spinelli's accounts were beginning to loosen COVID-19 restrictions to allow in-person visits.

27.     Even before the onset of the COVID-19 Pandemic, Oncology practices across the nation severely restricted access to in-person visits due to the nature of the field and associated risk factors. For example, there was a one-year waiting list with most offices to provide a

lunch-and-learn program on site. Accordingly, requiring 60% of interactions to be face-to-face visits was nearly impossible even before COVID-19 restrictions were in place.

28.     Upon learning of the Vaccine Mandate and looming deadline, Mr. Spinelli consulted with his primary healthcare provider, Monica Ortega, for a medical opinion and recommendation on whether the COVID-19 vaccine would be safe for him, considering his medical history.

29.     While working as a Hospital Account Manager for another employer in June of 2015, Mr. Spinelli was required to receive a series of vaccines. Within two weeks of receiving the Varicella vaccine (to protect against chickenpox), Mr. Spinelli experienced a significant adverse reaction that caused the entire left side of his torso and face to become paralyzed. Although he regained partial mobility approximately a month later, Mr. Spinelli was left with permanent, irreversible nerve damage as a result of the vaccination.

30.     On or about July 19, 2021, Mr. Spinelli submitted a valid medical exemption request to Defendant.

31.     The Healthcare Provider's Note reflected that, "Mr. Spinelli has a prior vaccine injury, which resulted in permanent nerve damage and trigeminal nerve problems. He is at an increased risk for further nerve damage and/or paralysis from the COVID-19 vaccines." and recommended, in her capacity as a healthcare professional, that Mr. Spinelli should not receive any of the three COVID-19 vaccines available at the time.

32.     Additionally, Mr. Spinelli submitted a request for religious exemption to Defendant due to his religious, spiritual, and Biblical beliefs. According to Plaintiff's sincerely held religious beliefs, Plaintiff may not put an experimental drug into his body, particularly one that is developed, tested, and/or produced with technology that an individual deems morally

repugnant. All three (3) Covid-19 vaccines in the United States used abortion-derived fetal cell lines in the development and testing of their drugs.

33.    Defendant never offered or proposed any accommodations to Plaintiff.

34.    Mr. Spinelli, however, offered to continue the status quo, working remotely with the majority (38) of his accounts since they had not yet reopened for in-person visits and the other two (2) accounts would be covered by or traded with another Oncology Account Manager.

35.    Plaintiff believed no undue hardship to Defendant existed because working remotely actually saved Defendant costs by avoiding travel, lodging, per diem and related expenses, while maintaining profit revenue generated by Mr. Spinelli's above-average sales performance that he demonstrated working remotely.

36.    On October 1, 2021, Mr. Spinelli received notice via email that his medical and religious exemption requests were denied, asserting that the accommodation sought would create an undue hardship and burden on the company's business and negatively impact its ability to do what is necessary to reach its revenue goals.

37.    The October 1, 2021 email also advised that Mr. Spinelli's last day of employment would be October 7, 2021.

38.    On October 6, 2021, Mr. Spinelli's penultimate day of employment, Defendant sent him a report with sales performance metrics. The report reflected that Mr. Spinelli finished number one in the company for third quarter sales achievement, with sales performance of 127% to goal. The next highest person in the company finished 118% to goal.

39.    Also on October 6th, Mr. Spinelli received a call from Vice President of Sales, Eric Gibbs, discussing how he finished number five in the company for Q2 and number one in

the company for Q3, and Mr. Gibbs stated that Mr. Spinelli has "done great things with [his] territory in such a short period of time."

40.    Later that same day, Mr. Spinelli was contacted by the Executive Vice President of Human Resources, Rebecca Sunshine. Ms. Sunshine presented Mr. Spinelli a severance package consisting of 2 months pay and healthcare coverage through December of 2021 on the condition that Mr. Spinelli had to sign a Mutual Separation Agreement, which included holding the company harmless, waiving his rights to sue, and making disparaging statements.

41.    Plaintiff learned that on October 9, 2021, the company's Restricted Stock Units matured for those employees that were hired three years prior, and they would have been eligible to receive approximately $30,000 worth of stock. But since Defendant made their last day of employment October 7, 2021, all of the unvaccinated employees that were fired, were not eligible for the matured stock.

42.    On October 11, 2021, the Human Resources department offered severance packages that included the $30,000 worth of Restricted Stock Units to the unvaccinated employees that would have qualified on the 9th, but only on the condition that except they sign the Mutual Separation Agreement.

43.    Shortly after being fired on October 7th, 2021, Mr. Spinelli filed a claim for unemployment benefits with the New Mexico Department of Workforce Solutions.

44.    Defendant disputed Mr. Spinelli's claim for unemployment benefits.

45.    After a review and investigation was conducted, the Department of Workforce Solutions issued its Notice of Determination on October 19, 2021.

46.    The Notice of Determination set forth the Department's Reasoning and Findings, which stated,

> The claimant was discharged but misconduct connected with the work has not been established. You discharged the claimant for not receiving the COVID-19 vaccine even though the claimant provided sufficient medical opinions from his doctor advising against inoculation. A medical note from the claimant's physician stating that the claimant cannot get the vaccine for medical reasons is sufficient for this agency to make a determination.

47.    On December 2, 2021, Mr. Spinelli filed a claim with the EEOC.

48.    On or about January 3, 2022, Defendant filed its Position Statement in response to Mr. Spinelli's EEOC Claim, stating "At the end of the day, Mr. Spinelli was unable to substantiate any valid medical exemption."

49.    On or about February 16, 2022, Mr. Spinelli submitted a reply to Defendant's Position Statement to clarify and correct the many factual inaccuracies contained in the Position Statement.

50.    It should be noted that the Defendant is not a licensed medical professional with the qualifications to state whether Plaintiff's medical exemption was valid or not.

51.    On November 19, 2021, Mr. Spinelli filed a claim with the NM Human Rights Bureau.

52.    On December 13, 2022, an Order of Non-Determination was issued by the NM Human Rights Bureau.

53.    The Covid-19 vaccines were already available to the public when Defendant recruited and hired Plaintiff, and yet Defendant failed to provide notice of its intent to mandate the vaccine when it hired Plaintiff. If Plaintiff had known that the vaccine would be mandated by Defendant before he accepted the job, Plaintiff would not have taken the position, and certainly would not have left his previous employment to work for Defendant.

54.     As a direct result of Defendant's unlawful discriminatory conduct, Plaintiff suffered severe emotional distress, including but not limited to severe Post-Traumatic Stress Disorder.

55.     Plaintiff continues to suffer these emotional damages as a direct result of Defendant's outrageous conduct, in an amount and type subject to being proven at trial.

## COUNT I
## DISCRIMINATION AND RETALIATION IN VIOLATION OF NMHRA

56.     Plaintiff reincorporates all preceding paragraphs as if fully set forth herein.

57.     In New Mexico, discriminatory employment practices are illegal pursuant to the New Mexico Constitution and the New Mexico Human Rights Act. It is an unlawful discriminatory practice for:

> A. **an employer,** unless based on a bona fide occupational qualification or other statutory prohibition, to refuse to hire, **to discharge,** to promote or demote or **to discriminate** in matters of compensation, **terms, conditions or privileges of employment against any person otherwise qualified because** of race, age, **religion**, color, national origin, ancestry, sex, sexual orientation, gender identity, pregnancy, childbirth or condition related to pregnancy or childbirth, **physical or mental handicap or serious medical condition,** or, if the employer has fifty or more employees, spousal affiliation; provided, however, that 29 U.S.C. Section 631(c)(1) and (2) shall apply to discrimination based on age;
> . . .
> J. **any employer to refuse or fail to accommodate a person's physical or mental handicap or serious medical condition**, unless such accommodation is unreasonable or an undue hardship;

NMSA 1978 § 28-1-7.

58.     Plaintiff is a member of a protected class pursuant to applicable law, namely, Plaintiff is a person with serious medical condition.

59.     Additionally, Plaintiff is also a person with sincerely held religious beliefs, which also qualifies him as a member of a protected class under the Act.

60.    Defendant engaged in a pattern and practice of unlawful discrimination and retaliation against Plaintiff because of Plaintiff's medical condition and religious belief that prevented him from taking the Covid-19 vaccination.

### A.  Serious Medical Condition & Disability

61.    Under the NMHRA, an employer cannot discharge or discriminate in matters of compensation, terms, conditions or privileges of employment against any person otherwise qualified because of a condition related to physical or mental handicap or serious medical condition. Likewise, the employer cannot refuse or fail to accommodate a person's physical or mental handicap or serious medical condition, unless such accommodation is unreasonable or an undue hardship. Finally, any employer is in violation of NMHRA if it refuses or fails to make reasonable accommodations for an employee or job applicant with a need arising from a serious medical condition. NMSA 1978 § 28-1-7.

62.    Here, Plaintiff submitted a request for medical exemption from the Vaccine Mandate, but it was denied by Defendant. As shown above, Plaintiff has a serious medical condition, or disability, preventing him from taking the COVID-19 vaccine. Plaintiff produced a medical exemption that was prepared by his provider, who directed him not to take the vaccine. Despite the legitimate request for a medical exemption supported by a qualified provider, Defendant, a non licensed medical professional, denied his request and offered him no accommodation.

63.    What is more, Defendant continued to engage in the unlawful practice of medicine, and proceeded to order Plaintiff to get a medical procedure, the COVID-19 vaccine, in direct conflict with the advice of Plaintiff's provider.

64.    The actions of Defendant violated the NMHRA insofar as it has discriminated against Plaintiff who has a serious medical condition or disability that makes vaccination particularly dangerous, by refusing to accommodate his condition and mandating vaccination for him anyway. Any notion that his medical condition is not serious enough when considered outside the Covid-19 vaccination context does not mean it is not serious for purposes of the Act. If vaccination presents a real risk of the condition becoming serious and exacerbated, then Plaintiff has a serious medical condition for purposes of the NMHRA that requires accommodation.

65.    The choice to accept or reject medical treatment and bodily invasions is an activity protected by a long line of Supreme Court cases and others. *Morris v. Brandenburg,* 2016-NMSC-027, ¶ 18, 376 P.3d 836, 844. Among compensatory, punitive and other damages, reasonable attorney's fees may be awarded at court's discretion to the prevailing complainant pursuant to New Mexico Human Rights Act. *Smith v. FDC Corp.,* 1990, 109 N.M. 514, 787 P.2d 433. Under NMHRA, Defendant is guilty of such damages, and Plaintiff is entitled to relief.

### B.   Sincerely Held Religious Beliefs

66.    According to Plaintiff's religious, spiritual, and Biblical beliefs, he may not put an experimental drug into his "body is a temple" according to his sincerely held religious or spiritual beliefs. 1 Corinthians 6:19-20 of the Bible (KJV). Similarly, if a vaccine, such as the COVID-19 Vaccines, is developed, tested, or produced with technology that an individual deems morally repugnant, such as the use of abortion-derived fetal cell lines, vaccine refusal is morally acceptable.

67.    The COVID-19 vaccines in the United States, employ fetal cell lines derived from procured abortion in testing, development or production of the vaccines. In particular:

A. Johnson & Johnson/Janssen: **Fetal cell cultures** `are used to produce and manufacture the J&J COVID-19 vaccine and the final formulation of this vaccine includes residual amounts of the fetal host cell proteins (≤0.15 mcg) and/or host cell DNA (≤3 ng).` https://www.fda.gov/media/146303/download

B. Pfizer/BioNTech: The HEK-293 **abortion-related cell line** was used in research related to the development of the Pfizer COVID-19 vaccine. https://www.biorxiv.org/content/10.1101/2020.09.08.280818v1.full.pdf

C. Moderna/NIAID: **Aborted fetal cell lines** were used in both the development and testing of Moderna's COVID-19 vaccine. 37. https://www.nature.com/articles/s41586-020-2622-0.pdf

68.    Plaintiff holds a sincere religious belief concerning abortion-connected vaccines: he opposes abortion under any circumstances, as he believe that abortion is the intrinsically evil killing of an innocent, and thus he also opposes the use of abortion-derived fetal cell lines for medical purposes and abortion derived fetal stem cell research and believes that he would be cooperating with the evil of abortion in a manner that violates his conscience and sincerely held spiritual beliefs.

69.    Plaintiff indisputably submitted a request for religious exemption with Defendant and complied with each and every requirement for the same. Therefore, Defendant was on notice of Plaintiff's sincerely held religious beliefs prohibiting him from obtaining the COVID-19 vaccination, See **Exhibit A**: *Request for COVID-19 Accomodation for a Religious Belief*, **Exhibit B**: *Email Correspondence from Plaintiff to Charmi Turner*, **Exhibit C**: *Respondent Coherus Biosciences, Inc.'s EEOC Position Statement, Page 4.* However, Plaintiff's religious exemption was flatly denied and Defendant consequently terminated his employment. While navigating the administrative process pro se, Plaintiff inadvertently omitted a check-mark on a box pertaining to religious discrimination on EEOC Form 5, Charge of Discrimination which was submitted with both the EEOC and the NMHRB.

70.     An important purpose of the administrative remedy exhaustion requirement is to give the employer notice of the claims against it. *See Henderson v. Dungarvin New Mexico*, LLC, No. 20-32 MV/JFR, 2021 U.S. Dist. LEXIS 59565 (D.N.M. Mar. 8, 2021). Based on the correspondence referenced as exhibits above, Defendant was indisputably on notice of Plaintiff's religious discrimination claim despite Plaintiff's inadvertent omission.

71.     Nevertheless, Defendant intends to amend his Charge of Discrimination to reflect the religious discrimination claim he brought before the administrative agencies. Plaintiff is corresponding with the EEOC and NMHRB on the same in order to facilitate this clarifying amendment.

72.     In sum, Defendant engaged in unlawful religious and medical discrimination by subjecting Plaintiff to different terms, conditions, and/or privileges of employment than employees without such sincerely held religious beliefs or medical conditions. Defendant failed to undertake measures to cure  the perpetuation of discriminatory policies and practices or to correct the disparities after they were brought to Defendant's attention. Additionally, Defendant failed to offer Plaintiff a reasonable accommodation, and therefore violated the NMHRA.

### C. Accommodations and Undue Hardship

73.     Title VII of the Civil Rights Act of 1964, is used as guidance by New Mexico when analyzing violations of the NMHRA. According to the Equal Employment Opportunity Commission ("EEOC") the "cost" or "expense" is not a factor to weigh in considering an undue hardship. Under Title VII, with respect to accommodations for a request for religious exemption for the COVID-19 vaccination, courts define:

> "undue hardship" as having more than minimal cost or burden on the employer. This is an easier standard for employers to meet than the ADA's undue hardship standard, which applies to requests for accommodations due to a disability. Considerations relevant to undue hardship can include,

among other things, the proportion of employees in the workplace who already are partially or fully vaccinated against COVID-19 and the extent of employee contact with non-employees, whose vaccination status could be unknown or who may be ineligible for the vaccine. Ultimately, if an employee cannot be accommodated, employers should determine if any other rights apply under the EEO laws or other federal, state, and local authorities before taking adverse employment action against an unvaccinated employee.[1]

74.    Here, Defendant has yet to articulate a legally cognizable undue hardship. Notably, Plaintiff demonstrated that his work and performance was not impacted by the protocols, such as remote work, that were put in place before the vaccine mandate was enforced by Defendant. As stated above Plaintiff had the most sales during the time in question and outperformed all other employees including the vaccinated. Moreover, working remotely actually saved Defendant costs related to Plaintiff's travel (airfare, rental cars, fuel), lodging, per diem, meals, etc. Plaintiff also posed no threat to other employees because he did not work in an office building with other people. Rather, Plaintiff worked completely alone in New Mexico.

75.    Plaintiff contends that even prior to the Covid-19 pandemic, the type of clients Plaintiff served before and while working for Coherus, did not permit face-to-face contact with sales representatives, as their patients were already at risk of exposure. Thus Plaintiff's profession allows him to do most, if not all of his work remotely from home, in isolation, posing no risk to other employees or clients, or even the public at large. Likewise, all of his clients had sophisticated guidelines and robust protocols in place to combat the spread of coronavirus, with social distancing, sanitizing, masking, covid testing, isolation, remote working, and self-assessments. At Coherus, only two (2) of Plaintiff's clients out of all 40 of his accounts, allowed face-to-face contact. Plaintiff proposed that those 2 clients could have easily been

---

[1] COVID-19 and the ADA, and other EEO Laws (Updated on May 28, 2021)
https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws

managed by another employee if the measures taken by Plaintiff were not sufficient for that client, yet Defendant refused to permit such an accommodation.

76.    Accordingly, Defendant never produced evidence demonstrating that Plaintiff's exemptions would render the workplace or his clients any more unsafe than it already was with vaccinated people. Nor did Defendant illustrate any undue hardship.

77.    Defendant's Vaccine Policy is unlawful in and of itself, but to add insult to injury Defendant has expressly discriminated against a specific protected class of people, people whose medical and/or spiritual beliefs prevent them from taking the vaccine, in its effort to coerce them into taking COVID-19 vaccine.

78.    The abusive language and veiled threats used by Defendant and its agents have caused Plaintiff to experience emotional distress, anxiety, and post traumatic stress disorder. Defendant's wrongful discharge of Plaintiff was retaliatory in nature because it stems from Plaintiffs' inability to take the COVID-19 Vaccine.

79.    Defendant failed to consider Plaintiff's requests for medical and religious exemptions, and also failed to offer a reasonable accommodation to Plaintiff in violation of the NMHRA. As a result of Plaintiff's exercise of his religious practices and right to be free from medical harm, Plaintiff was retaliated against by Defendant, and wrongfully terminated from his employment with Defendant.

80.

81.    The violations of the New Mexico Human Rights Act inflicted damage upon Plaintiff in an amount and type to be proven at trial.

## COUNT II
## BREACH OF EMPLOYMENT CONTRACT

82.    Plaintiff reincorporates all preceding paragraphs as if fully set forth herein.

83.     There existed an implied employment contract between Plaintiff and Coherus Biosciences prohibiting termination absent compliance with policies, procedures, and rules, and Defendant's course of conduct regarding the same.

84.     The general rule in New Mexico "is that an employment relationship may last for an indefinite time and is terminable at the will of either party unless there is an express contractual provision stating otherwise." *Hartbarger v. Frank Paxton Co.,* 115 N.M. 665, 668, 857 P.2d 776, 779 (1993).

85.     New Mexico recognizes an exception to the at-will employment doctrine: "an implied contract term that restricts the employer's power to discharge an employee and retaliatory discharge." *Id.*

86.     An implied employment contract restricting an employer's power to discharge may be found where the employer made direct or indirect reference that termination would be only for just cause or where the employer has established procedures for termination that include elements such as a probationary period, warnings for proscribed conduct, or procedures for employees to air grievances. *Id.*

87.     The New Mexico Supreme Court "has upheld a finding of an implied contract based on employee manuals, **words, and conduct of parties**." (emphasis added). *See Newberry v. Allied Stores, Inc.,* 108 N.M. 424, 427, 773 P.2d 1231, 1234 (1989). *See also, Forrester v. Parker,* 93 N.M. 781, 782, 606 P.2d 191, 192 (1980).

88.     Defendant's agents verbally represented to Plaintiff that he would only be fired for good reason, such as poor work performance, lack of punctuality, and criminal behavior. In addition, Defendant established procedures and a course of conduct for submitting exemptions from Defendant's vaccine mandate as applied to employees. According to the Supreme Court's

holding in *Hartbarger,* Defendant's representations and established policies, procedures and course of conduct formed an implied contract between Plaintiff and Defendant.

89.    With respect to Defendant's established policies and course of conduct for its vaccine mandate, Defendant permitted Plaintiff, and all employees, to submit a request for medical exemption from the vaccine mandate. Plaintiff not only submitted such a request, Plaintiff also submitted a request for a religious exemption as well, which Defendant later acknowledged. Subsequently Defendant required that Plaintiff produce more information from his medical provider, and Plaintiff produced the same.

90.    Plaintiff's medical provider prepared a letter for him on her letterhead stating among other things that: "Mr. Spinelli has a prior vaccine injury, which resulted in permanent nerve damage and trigeminal nerve problems. He is at an increased risk for further nerve damage and/or paralysis from the Covid-19 vaccines."

91.    Despite Plaintiff's absolute compliance with Defendant's policies, procedures and rules surrounding medical exemption requirements against the vaccine mandate, Defendant still fired Plaintiff. Defendant, a non medical professional, concluded, without explanation, that the medical provider's letter and Plaintiff's medical exemption request was not sufficient. Defendant's attorney later stated that it was denied because the provider's letter was a "vague response … by an unknown health care [sic]."

92.    However, Plaintiff's provider's note was not vague; it was quite specific and tailored to the matter at hand, not to mention that the provider has to comply with HIPAA and is not permitted to disclose personal medical information of its patients. Moreover, Defendant did not inform Plaintiff that the letter needed to be prepared by a provider that Defendant knew nor did Defendant request additional information about the healthcare provider. It should be noted

that Plaintiff and his provider live in New Mexico, and Defendant and its agents in question reside in California, it is therefore not surprising that Defendant's lawyer did not know Plaintiff's provider.

93.     In fact, the New Mexico Department of Workforce Solutions found the defendant liable for unemployment benefits on grounds that Plaintiff had provided sufficient documentation from his provider advising against inoculation, yet Plaintiff was still terminated for his inability to obtain the COVID-19 vaccine. The Department's Notice of Determination of eligibility benefits states in pertinent part "the claimant was discharged but misconduct connected with the work has not been established. [Coherus] discharged the claimant for not receiving the COVID-19 vaccine even though the claimant provided sufficient medical opinions from his provider advising against inoculation." See **Exhibit D**: *Notice of Determination.*

94.     Furthermore, Defendant failed to provide grounds as to why Plaintiff's request for religious exemption was denied. Defendant's agent, Rebecca Sunshine, simply stated "the Company respectfully disagrees that such exemptions are appropriate here".

95.     Plaintiff complied with Defendant's policies, procedures and rules, and pursuant to the implied contract between Plaintiff and Defendant, should not have been terminated from employment, without just cause.

96.     Defendant's termination of Plaintiff, despite his absolute and good-faith compliance with its procedures, policies and course of conduct governing its potential vaccine mandate exemption, constitutes a breach of the implied employment contract between Plaintiff and Defendant.

97.     In addition, Defendant's termination of Plaintiff without just cause constitutes an additional breach of implied contract, based on the verbal representations of Defendant's agents

to Plaintiff in which they informed him that his employment would only be terminated for good reason.

98.    Defendant willfully and unlawfully breached the implied contract contract governing the employment relationship between Plaintiff and Defendant without cause or privilege to do so.

99.    Defendant's actions were done willfully, in bad faith, with reckless and wanton disregard of its clearly foreseeable impact upon Plaintiff and as such constitutes adequate basis for an award of exemplary damages in Plaintiff's favor.

100.    As a direct result of that breach, Plaintiff has been injured in an amount to be proven at trial.

**COUNT III**
**BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**

101.    Plaintiff reincorporates all preceding paragraphs as if fully set forth herein.

102.    Defendant breached the implied contract that governed its employment relationship with Plaintiff as established in Count II.

103.    There is in every contract, including the contract described herein, a covenant of good faith and fair dealing.

104.    The concept of the implied covenant of good faith and fair dealing requires that neither party do anything that will injure the rights of the other to receive the benefit of their agreement. *Ortiz v. Zia Credit Union*, No. A-1-CA-37920, 2021 N.M. App. Unpub. LEXIS 288 (Ct. App. Aug. 30, 2021)

105.    Plaintiff indisputably complied in good-faith with Defendant's policies, procedures, and course of conduct for requesting an exemption to the vaccine mandate.

Additionally, Defendant verbally represented to Plaintiff that Plaintiff's employment would only be terminated for just cause.

106.    Nevertheless, Defendant wrongfully terminated Plaintiff, thus depriving Plaintiff of his right to receive benefits under the employment agreement, including, but not limited to: (i) loss of a $175,000 annual salary, (ii) loss of eligibility for a performance bonus targeted at $50,000 annually, (iii) loss of an option to purchase 8,000 shares of the common stock of the Company pursuant to the Defendant's Employment Commencement Incentive Plan, (iv) loss of group health insurance, dental insurance, vision insurance, flexible spending, life insurance, and disability insurance, (v) loss of accrued paid time off and (vi) loss of use of company vehicle.

107.    Defendant unlawfully breached  the covenant of good faith and fair dealing without cause or privilege to do so. Defendant's actions were done willfully, in bad faith, with reckless and wanton disregard of their clearly foreseeable impact upon Plaintiff and as such constitute breaches, Plaintiff has been injured in an amount to be proven at trial.

## COUNT IV
## COMMON LAW RETALIATION

108.    Plaintiff reincorporates all preceding paragraphs as if fully set forth herein.

109.    As set forth above, Plaintiff in good faith complied with Defendant's procedures, policies and established course-of-conduct regarding application for exemptions from Defendant's COVID-19 vaccination mandate. As a result, Plaintiff was required to disclose (i) his sincerely held religious beliefs prohibiting him from receiving the inoculation and (ii) Plaintiff's serious medical condition rendering him unable to receive the same.

110.    After Plaintiff made his required disclosures, Defendant summarily retaliated against Plaintiff through terminating his employment without justification.

111.    Plaintiff's conduct was authorized and protected by public policy on the following grounds: (i) a workplace free from religious discrimination, medical discrimination, and discrimination based upon other protected class distinctions is of vital interest to the public at large and (ii) maintaining personal bodily integrity and medical choice is necessary for the preservation of individual liberty guaranteed by both State and Federal Constitutions.

112.    The aforementioned protected disclosures were contributing and motivating factors behind Defendant's decisions to take wrongful employment actions against Plaintiff.

113.    As a direct, foreseeable and proximate result of Defendant's retaliatory actions against Plaintiff, he has suffered and continues to suffer damages in an amount and type subject to be proven at trial.

114.    Defendant's wrongful acts were done willfully, in bad faith, with reckless and wanton disregard of its clearly foreseeable adverse impact on Plaintiff and as such constitute adequate basis for an award of exemplary damages in Plaintiff's favor.

## COUNT V
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

115.    Plaintiff reincorporates all preceding paragraphs as if fully set forth herein.

116.    Intentional infliction of emotional distress arises when a defendant intentionally or recklessly causes severe emotional distress through extreme and outrageous conduct. *Jaynes v. Strong-Thorne Mortuary, Inc*., 1998-NMSC-004, 124 N.M. 613, 954 P.2d 45.

117.    Courts have allowed a claim for intentional infliction of emotional distress in the employment context when the employer uses its power to coerce a plaintiff into doing something he would not otherwise do and to retaliate against the plaintiff. *See Chaffin v. BHP Billiton,* 2019 U.S. Dist. LEXIS 163935 (D.N.M. Sep. 25, 2019).

118.    Defendant's willful, wanton and malicious discrimination against Plaintiff on the basis of his sincerely held religious beliefs, use of its power to coerce Plaintiff into violation of the same, and subsequent retaliation, as described in the preceding sections, constitutes extreme and outrageous conduct.

119.    Defendant's willful, wanton and malicious medical discrimination against Plaintiff, use of its power to coerce Plaintiff to take action that would cause him medical harm, and subsequent retaliation, as described in the preceding sections, constitutes extreme and outrageous conduct.

120.    Defendant's wrongful conduct, as described in paragraphs 118 and 119, was intentional or in reckless disregard of Plaintiff.

121.    Defendant's wrongful conduct, as described in paragraphs 118 and 119, caused Plaintiff to develop a severe form of post-traumatic stress disorder.

122.    Defendant's wrongful conduct, as described in paragraphs 118 and 119, caused Plaintiff distress that no reasonable person could be expected to endure.

123.    More specifically, Plaintiff's emotional distress is severe enough that a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by Defendant's conduct.

124.    As a direct, foreseeable and proximate result of Defendant's intentional infliction of emotional distress against Plaintiff, he has suffered and continues to suffer damages in an amount and type subject to be proven at trial.

**WHEREFORE**, the Plaintiff respectfully requests judgment in his favor and prays for compensatory and punitive damages against Defendant, and for attorney's fees and costs, prejudgment interest, and any other relief the Court deems just and proper.

Respectfully submitted,

**DENIRO LAW, LLC**

*/s/ Vanessa L. DeNiro*
Vanessa L. DeNiro
*Attorney for Plaintiff*
P.O. Box 45104
Rio Rancho, NM 87174
Office#:  (505) 977-8975
Fax#:  (505) 750-9836
vanessa@denirolaw.com

## CERTIFICATE OF SERVICE:

I hereby certify that a true and correct copy of the foregoing document was electronically filed and delivered to:

Faith Kalman Reyes
VERDI & OGLETREE PLLC
150 Washington Ave. No. 201
Santa Fe, NM 87501
Mobile: 505.660.0749
freyes@verdiogletree.com

Ryan Carlson, Esq.
Iman A. Wells, Esq.
NUKK-FREEMAN & CERRA, P.C.
26 Main Street, Suite 202
Chatham, New Jersey 07928
Tel: (973) 665-9100
Fax: (973) 665-9101
rcarlson@nfclegal.com
iwells@nfclegal.com

*/s/ Vanessa L. DeNiro*                    May 24, 2023
Vanessa L. DeNiro, Esq.                   Date